# Court of Appeals.

### June, 1887.

## PEOPLE v. ELLIOTT.

### (*Reversing* 5 *N. Y. Crim. Rep.* 204.)

### EVIDENCE.—CORROBORATION OF ACCOMPLICE.—CODE CRIM. PROC. § 399.

Although each circumstance of the corroboration of an accomplice be inconclusive if taken by itself, yet it is sufficient if, when taken together, these circumstances furnish some corroborative evidence as required by § 399 of the Code of Criminal Procedure.

It is not necessary that the corroborative evidence itself should be sufficient to show the commission of the crime, or to connect the defendant therewith. It is enough if it tends to connect the defendant with the commission of the crime.

Such corroborative evidence need not be wholly inconsistent with the theory of defendant's innocence.

The court before it submits the case to the jury should be satisfied that there is some corroborative evidence fairly tending to connect the defendant with the commission of the crime, and if there is any such evidence it is for the jury to determine whether the corroboration is sufficient to satisfy them of defendant's guilt.

Appeal by the people from a judgment of the General Term of the Supreme Court in the Fifth Department, of April 21, 1887, reversing a conviction of Joseph Elliott, the defendant, by the Court of Sessions of the County of Monroe, of forgery in the second degree charged as a second offense.

The facts are given in the report of the case at the General Term, 5 *N. Y. Crim. Rep.* 204.

*Geo. A. Benton,* district-attorney, for the people, appellants.

*P. Chamberlain, Jr.,* for defendant, respondent.

EARL, J.—The defendant was idicted for the crime of forgery in the second degree, charged as a second offense, in uttering a forged draft for $3,900 purporting to be drawn by the Montreal Bank upon the National Bank of Republic of New York. He was convicted, and sentenced to imprisonment in the State prison at Auburn for the term of fifteen years. The principal evidence against him at the trial was that of an accomplice, and it is claimed on his behalf that the testimony of the accomplice was not sufficiently corroborated, and upon that ground the Supreme Court reversed the conviction and granted a new trial.

The accomplice testified, among other things, that he met the defendant in New York in July, 1885, that an arrangement was there made between them, in pursuance of which they went to Rochester and there the defendant planned the crime, and handed him the forged draft to obtain the money from the Flour City Bank; that he took the draft to that bank and obtained credit for it on the 14th day of August, and on the next day he drew a check upon the bank by direction of the defendant, and obtained $2,500, of which sum he paid the defendant $2,000. It appeared upon the trial, by evidence other than the testimony of the accomplice, that the defendant had been tried and convicted of the crime of forgery in the city of New York on November 13, 1878, and was sentenced for the term of four years to the State prison at Sing Sing, and that he served out his term; that he and the accomplice were acquaintances and associates in the city of New York before going to Rochester, and Charlotte, near Rochester, for some days prior to the commission of the offense, and that he registered under an assumed name as J. W. Clay, of Paterson, New Jersey, at two different hotels in Ro-

chester and at a hotel at Charlotte; that they were together at Charlotte, where the defendant introduced the accomplice to another person, and that he admitted he was in Rochester, and he was seen there, during the week when the forgery was committed. He had no apparent business in Rochester, and gave no explanation of his presence there. The president of the Flour City National Bank testified that he thought he had seen him in the Bank. He did not specify the time when that occurred; but as the inquiry related to no other time, and there was no evidence that the defendant was in Rochester at any other time, the fair inference is that it was about the time of the commission of the offense. After his arrest the defendant falsely declared that he had never seen the accomplice, and that he did not know him. He was arrested for the offense by a detective in the city of New York, and before he was informed for what he was arrested, he asked the detective if any one else had been arrested on the same charge. He told the detective that Inspector Byrnes said he would get twenty years. One Wilkes, who was also arrested at the same time, and was present, said that if he (Elliott) got twenty years they could do nothing with him. And Elliott said to Wilkes, "If I go, you will go," and Wilkes said, "No; there wasn't no man living could tell anything about him." Defendant said he was satisfied there was some "squealing"—that there was a "give away." He asked the detective if he had any one in Rochester under arrest. The detective asked "Why?" He said he "wanted to know;" that "there must be somebody who had done some talking." The detective then asked him why he did not get the money at the German-American Bank instead of at the Flour City Bank: and he answered, "Is that what you want me for?" The detective said "Yes;" and the defendant said, "If that is what you want me for, I can show that I am not the party, if you want me for getting the money there," and he stated further to the detective, that he "would stand up in any

place, with whiskers on or off, and see if they could identify him as the man." Again he said, "No, you are mistaken. I did not do it. But I know who did."

All these circumstances certainly have some tendency to corroborate the evidence of the accomplice, and they seem to us to satisfy the requirements of the section of the Criminal Code referred to. Each circumstance, taken by itself, is quite inconclusive; but, when considered together, they certainly furnish some corroborative evidence. It is not necessary that the corroborative evidence itself should be sufficient to show the commission of the crime, or to connect the defendant with it. It is sufficient if it tends to connect the defendant with the commission of the crime. Nor need the corroborative evidence be wholly inconsistent with the theory of the defendant's innocence. The court, before it should submit the case to the jury, should be satisfied that there is some corroborative evidence fairly tending to connect the defendant with the commission of the crime, and, when there is, then it is for the jury to determine whether the corroboration is sufficient to satisfy them of the defendant's guilt. As we said in People *v.* Everhardt, 104 *N. Y.* 591; 6 *N. Y. Crim. Rep.* 231: "The law is complied with if there is some evidence fairly tending to connect the defendant with the commission of the crime, so that the conviction will not rest entirely upon the evidence of the accomplice." See also People *v.* Jaehne, 103 *N. Y.* 182; 4 *N. Y. Crim. Rep.* 478. Here, within the rule thus laid down, there was such other evidence, and we are therefore of the opinion that the judgment ought not to have been reversed.

The judgment of the Supreme Court should, therefore, be reversed, and that of the Court of Sessions of Monroe county affirmed, and the proceedings remanded to that court, with directions to enforce its judgment of conviction by committing the defendant to the Auburn State prison to serve the unexpired term of his original sentence.

All concur.

NOTE ON CORROBORATION OF ACCOMPLICE.

See People *v.* Courtney, 1 *N. Y. Crim. Rep.* 64 ; People *v.* Ryland, *Id.* 123 ; affirmed, 2 *Id.* 441 ; People *v.* Hoogkerk, 2 *Id.* 204 ; People *v.* Thompson, 3 *Id.* 562 ; People *v.* Ogle, 4 *Id.* 348 ; affirmed, 6 *Id.* 165 ; People *v.* Everhardt, 5 *Id.* 91 ; affirmed, 6 *Id.* 231 ; People *v.* McCallam, *Id.* 543 ; People *v.* Sharp, *Id.* 388 ; People *v.* Sherman, *Id.* 543 ; People *v.* O'Neill, 6 *Id.* 48 ; People *v.* Emerson, *Id.* 157 ; People *v.* Kerr, *Id.* 406.